## ASHLAND IRON & MINING CO. et al. v. UNITED STATES.

No. J-391.

Court of Claims.

March 7, 1932.

This case having been heard by the Court of Claims, the court, upon the evidence adduced, makes the following special findings of fact:

1. The plaintiff was a corporation organized under the laws of the state of Kentucky and pursuant to such laws and proper corporate action, about June 28, 1923, ceased business and appointed one John Russell as liquidating agent and trustee, who has since been acting in that capacity.

2. On September 13, 1918, the plaintiff filed income and profits tax returns for the fiscal year ending June 30, 1918, and about May 17, 1919, filed a supplemental return for the same fiscal year.

The plaintiff, in the returns filed September 13, 1918, reported a total net taxable income of $1,614,464.32 and a tax liability of $426,115.90. In the return filed May 17, 1919, plaintiff reported a total net income of $1,522,009.92 and a further tax liability of $245,722.90 under the 1918 revenue act. The total tax of $671,838.80 together with a penalty of $61,430.73 was assessed by the Commissioner of Internal Revenue at the time the returns showing such tax liability were filed. Thereafter the payment of the tax so assessed was made as follows: September 13, 1918, $426,115.90; May 17, 1919, $245,722.90 —and the penalty of $61,430.73 was abated.

3. Between April 6, 1917, and June 30, 1918, the plaintiff, Ashland Iron & Mining Company, constructed, erected, installed, and acquired buildings, machinery, and equipment, and other facilities for the production of articles contributing to the prosecution of war against the German government. These facilities (known and described as the open hearth plant and facilities) and their costs were as follows:

| | |
|---|---|
| Machine shop | $ 23,295.72 |
| Shop machinery | 47,157.43 |
| Sheet mill | 41,844.43 |
| Open hearth plant | 1,494,676.49 |
| Total | $1,606,974.12 |

The capacity of the open hearth plant and facilities, above mentioned, was 342,000 tons per year, and the highest production or actual use of these facilities in any one of the postwar years by the plaintiff was, for the year 1920, an amount of 211,590 tons. On December 31, 1921, this plant and all other as-

sets of the plaintiff (except this claim in suit against the United States government for a refund of taxes) were sold to the American Rolling Mill Company, and the maximum use by the American Rolling Mill Company was, for the year 1923, an amount of 209,307 tons. The use for the other years was as follows:

|  | Tons |
|---|---|
| 1919 | 130,007 |
| 1921 | 62,290 |
| 1922 | 161,941 |

Compared with capacity, there existed a use by the plaintiff, the Ashland Iron & Mining Company, of the open hearth plant and facilities after the cessation of the war of only 61.7 per cent. of capacity and a loss in useful value of 38.3 per cent. of the cost. 38.3 per cent. of the cost of $1,606,974.12 equals $615,471.00.

4. The assets so sold and the depreciated costs thereof to the plaintiff, on December 31, 1921, were as follows:

| | | |
|---|---|---|
| 1. | Plant and equipment | $3,569,196.49 |
| 2. | Bar and plate mill materials | 324,881.93 |
| 3. | Inventories | 1,408,943.17 |
| 4. | Notes and accounts receivable | 727,233.58 |
| 5. | Miscellaneous stock holdings | 1,288,086.13 |
| 6. | Liberty loan bonds | 450.00 |
| 7. | Prepaid insurance | 2,656.20 |
| 8. | Prepaid interest | 450.21 |
| 9. | Bond discount | 18,893.44 |
| 10. | Cash | 136,110.29 |
| | Total | $7,476,901.44 |

The plaintiff received for the property sold 39,875 shares of the common stock of the American Rolling Mill Company and the assumption of certain outstanding mortgages, accounts, and notes. The market value of the common stock was at the time it was received $35.75 a share, or $1,425,531.25.

The outstanding mortgage notes, mortgage bonds, accounts payable, and notes payable of the plaintiff, Ashland Iron & Mining Company, on December 31, 1921, so assumed by the American Rolling Mill Company, were as follows:

| | | |
|---|---|---|
| 1. | Ashland Iron & Mining Company mortgage notes assumed by American Rolling Mill Co. | $2,373,550.00 |
| 2. | Ashland Iron & Mining Company mortgage bonds assumed by American Rolling Mill Co. | 1,230,000.00 |
| 3. | Ashland Iron & Mining Company accounts payable assumed by American Rolling Mill Co. | 852,767.18 |
| 4. | Ashland Iron & Mining Company notes payable assumed by American Rolling Mill Co. | 152,265.14 |
| | Total | $4,608,582.32 |

5. Of the said assets so sold by the plaintiff herein to the American Rolling Mill Company on December 31, 1921, the following items equalled or exceeded in value the said cost to the plaintiff as of that date:

| Item | | Cost | Value on Dec. 31, 1921, as per testimony |
|---|---|---|---|
| 10 Cash | | $136,110.29 | $ 136,110.29 |
| 9 Bond discount | | 18,893.44 | 18,893.44 |
| 8 Prepaid interest | | 450.21 | 450.21 |
| 7 Prepaid insurance | | 2,656.20 | 2,656.20 |
| 6 Liberty Loan bonds | | 450.00 | 450.00 |
| 5 Miscellaneous stock holdings: Stock of— | | | |
| Ashland Coal & Iron Railway Company | $1,156,036.91 | | 4,258,387.00 |
| Norton Iron Works | 115,100.00 | | 650,000.00 |
| I. T. T. Co. | | | |
| Kentucky Solvay Coke Co. | [1] 16,949.22 | | 16,949.22 |
| Tygart Limestone Company | | | |
| | $1,288,086.13 | 1,288,086.13 | |
| 3 Inventories | | 1,408,943.17 | 1,408,943.17 |
| 2 Bar and plate mills materials | | 324,881.93 | 324,881.93 |
| | | $3,180,471.37 | $6,817,721.46 |

[1] The plaintiff arrived at the figure of $16,949.22 as the cost and December 31, 1921 value of the Inter-Terminal Transit Company, the Kentucky Solvay Coke Company, and the Tygart Limestone Company, by adding $37,100, which was the par value, and which the plaintiff considered the fair value of the Kentucky Solvay Coke Company stock, to $10,000, which was the par value, and which the plaintiff considered the fair value of the Tygart Limestone Company stock, and by deducting therefrom the sum of $30,150.78 on the Inter-Terminal Transit Company item, which represented the difference between the sum of approximately $46,000 which the Inter-Terminal Transit Company owed the plaintiff, and the sum of $15,000, which represented the entire capital stock of the said Inter-Terminal Transit Company.

Of the assets so sold by the plaintiff herein to the American Rolling Mill Company on December 31, 1921, the following items were of less value than the said depreciated cost or book value to the plaintiff on that date:

Inventory Adjustment, Donations to King's Daughters Hospital, Amortization, Open Hearth Reserves and Sheet Mill Plant Adjustment, also adjustment of invested capital based upon reorganization in 1902."

| Item | Depreciated cost December 31, 1921 | Actual value on December 31, 1921 |
|---|---|---|
| 4. Notes and accounts receivable...................................... | $ 727,233.58 | $577,233.58 |
| 1. Plant and equipment............................................ | 3,569,196.49 | 600,000.00 |
| The $3,569,196.49 is made up as follows: | | |
| Depreciated cost to plaintiff of open hearth plant and facilities on Dec. 31, 1921............ $1,276,678.62 | | |
| Depreciated cost to plaintiff of other plant and equipment on Dec. 31, 1921 [2].................... 2,292,517.87 | | |
| $3,569,196.49 | | |

The depreciated cost of the open hearth plant on December 31, 1921, was........ $1,276,678.62
Depreciated cost on all other plant facilities ..................................... 2,292,517.87

Total depreciated cost of entire plant and equipment thereof of the plaintiff as of December 31, 1921......... $3,569,196.49
The ratio of the depreciated cost of the open hearth plant and facilities (war facilities) to the total depreciated cost of the plant as above is................. 35.76%
Total loss on sale of property to American Rolling Mills of all of plaintiff's assets after allowance for depreciation [2]$1,442,787.87
Less loss on accounts receivable........ 150,000.00

Loss on sale of plant..................... $1,292,787.87

6. The plaintiff deducted depreciation on the open hearth plant and facilities (war facilities) from June 30, 1918, to December 31, 1921, of $330,295.50,[3] and had no income in the fiscal year ending June 30, 1919, but a net loss of $374,813.16 was sustained.

7. Thereafter and on February 25, 1924, plaintiff filed a claim for refund of the income and profits tax so paid in the amount of $675,098.29, which was for the fiscal year ending June 30, 1918, and included income taxes paid by the Ashland Coal & Iron Railway Company, a subsidiary of the plaintiff, in the amount of $3,259.49. The grounds for the refund were stated in the claim as follows:

"The basis of this claim * * * consists of certain adjustments to income including Depreciation, Loss on Bar and Plate Mill,

Thereafter, the Commissioner of Internal Revenue, in and by a letter dated July 28, 1927, allowed the said refund claim, in the amount of $233,424.19 and rejected the balance of said claim in the amount of $441,674.10. The said sum of $233,424.19 was subsequently paid and refunded to plaintiff. A copy of said letter from the Commissioner of Internal Revenue, dated July 28, 1927, together with schedules attached thereto, is attached to the plaintiff's petition as Exhibit A and is made a part hereof by reference.

The Commissioner refused to allow plaintiff any amount as a deduction in arriving at the net taxable income for the fiscal year ending June 30, 1918, for amortization of the said open hearth plant and facilities.

8. The plaintiff, Ashland Iron & Mining Company, prior to 1917, operated a steel plant at Ashland, Ky., comprised of blast furnaces, ore bins, coke ovens, electric plant, locomotives, cranes, and all the necessary equipment for such an enterprise.

Beginning in November, 1916, the said plaintiff began to make large additions to its plant and thereupon let a series of contracts to manufacturers of this class of equipment covering these improvements and various additions. One of these contracts was for the construction, erection, and equipping of a one hundred and forty-four inch plate mill and a twenty-four inch bar mill; and

[2] The total loss to plaintiff, as shown by the sale of all its properties on December 31, 1921, to the American Rolling Mills Company was $1,442,787.87, the difference between the depreciated cost of $7,476,901.44 and the consideration received of $6,034,113.57, which equals $1,442,787.87.
Of this $1,442,787.87 the testimony shows that there was a specific loss of $150,000 on the accounts receivable, as shown above. No other item sold at this time had a less value than the depreciated value on the books, except the plant and equipment. This plant and equipment had a depreciated value on the books of $3,569,196.49. The plant, by reason of the excessive use to which it had been put during the war, was not worth more than scrap. Therefore, the entire balance of the said loss, $1,292,787.87 (total loss on sale of $1,442,787.87 minus $150,000 loss on accounts receivable), occurred in the sale of the plant.

[3] Cost open hearth plant and facilities to June 30, 1918............................................ $1,606 974.12
Depreciated cost, December 31, 1921.................................................... 1,276,678.62

Depreciation deducted .................................................................... $ 330,295.50

contracts were entered into to furnish the necessary machinery and special parts for the said plate and bar mills. The total amount of the contracts for the bar and plate mills was approximately $1,500,000.

The contractors thereafter commenced the manufacture of the necessary parts and equipment and proceeded with the construction of the said mills and the equipment therefor.

In the fiscal year ending June 30, 1918, the plaintiff on account of its financial condition and for other reasons, abandoned the erection of these mills and equipment thereof, canceled the contracts, and notified the contractors to cease all operations and completion of the project. The contractors, in said year, acquiesced in the abandonment and thereafter no further steps were taken toward either the construction of the said bar and plate mills or the equipment thereof. At the time of abandoning the said mills they were in an incompleted state and were never completed, or the construction work thereon recommenced. In the fiscal year 1918, plaintiff admitted liability to the contractor on its contract for the construction of the plate and bar mill by reason of the matters above stated.

The contractors, in said fiscal year ending June 30, 1918, accepted the abandonment of the said mills and rendered bills against the plaintiff Ashland Iron & Mining Company for the work performed to this date thereon, and for damages for cancellation of their contracts. As a result of this said abandonment of said mills in the fiscal year ending June 30, 1918, the plaintiff Ashland Iron & Mining Company suffered a net loss in said year of $970,702.61 after full credit for all salvage value had been made by the contractors.

This loss occurred within the taxable year beginning June 30, 1917, and ending June 30, 1918. The plaintiff kept its books on a basis of a fiscal year ending June 30.

9. A claim for deduction from the plaintiff's net taxable income for the fiscal year ending June 30, 1918, arising out of this loss of $970,702.61 on the bar and plate mills was included by the plaintiff in its claim for refund filed as above stated, but the Commissioner refused to allow any deduction against the income of the plaintiff for the fiscal year ending June 30, 1918, for any part of said loss.

Paul Armitage, of New York City (George B. Furman, of Washington, D. C., on the brief), for plaintiffs.

Charles B. Rugg, Asst. Atty. Gen. (George H. Foster, of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and WHALEY, WILLIAMS, LITTLETON, and GREEN, Judges.

GREEN, Judge.

The Ashland Iron & Mining Company, now in the hands of John Russell, liquidating agent and trustee, is a corporation that during the year 1918 was engaged in manufacturing war facilities by means of an open hearth steel mill and accessories. It also had begun the construction of a plate and bar mill to be used for the production of war facilities in connection therewith. The corporation filed its income tax return for its fiscal year of 1918 ending June 30 of that year, and in this return and an amendment thereto claimed a certain amount of deductions and amortizations upon the two plans above referred to. Its returns showed a tax of $426,115.90, which was paid September 13, 1918. Afterwards the commissioner assessed an additional tax of $245,722.90 with a penalty of $61,430.73. The penalty was subsequently abated, but the additional tax was paid by the company in May, 1919. Thereafter, the plaintiff duly filed a claim for refund for $675,098.29, which amount includes income taxes of $3,259.49 paid by a subsidiary of the plaintiff. The grounds of the claim were stated to be " * * * certain adjustments to income including Depreciation, Loss on Bar and Plate Mills, Inventory Adjustment, Donation to King's Daughters Hospital, Amortization, Open Hearth Reserves and Sheet Mill Plant Adjustment. Also adjustment of invested capital based on reorganization in 1902."

The Commissioner of Internal Revenue on July 28, 1927, allowed $233,424.19 of the claim but rejected the balance. Plaintiff now brings this suit, alleging that the action of the Commissioner was erroneous, and that it is entitled to recover $384,906.91.

The plaintiff makes two contentions: First, that the Commissioner failed to allow as a deduction from net taxable income a loss of $970,702.61 sustained by the taxpayer in its fiscal year of 1918 by reason of the abandonment of its uncompleted project to construct a new bar and plate mill and equip it; second, that the Commissioner failed to allow as a deduction from net taxable income for said year a reasonable allowance for the amortization of the war facilities, consisting of an open hearth plant erected and installed

after April 6, 1917, for the production of articles contributing to the prosecution of the war against Germany, and plaintiff claims that the evidence establishes that this allowance should not have been less than $615,471.

Plaintiff alleges that the action of the Commissioner on these two items resulted in an overassessment of tax in the amount of $440,049.19.

The issue in the case is as to whether this action of the Commissioner was correct. More specifically it should be said that the issue in relation to the deduction on account of the suspended construction of the plate and bar mill arises out of the fact that the commissioner allowed only one-half of the deduction for the fiscal year of 1918 and carried the remainder over into the following year in which plaintiff sustained a net loss and therefore got no benefit from the deduction. The defendant contends that this action of the Commissioner was proper in view of the facts and the law pertaining to the case.

With reference to the amortization on the open hearth plant, the contention of defendant in general is that there is no evidence in the case through or under which the amount of amortization provided by law can be ascertained, and therefore plaintiff's claim must fail in this respect.

■ It will be seen that the parties to the action differ not so much as to the law as they do with reference to what is shown by the evidence. No exceptions were filed to the report of the Commissioner, who took the evidence in the case, but the defendant moves to strike out finding 32 of the Commissioner, reading: "This loss [the loss on the plate and bar mill] occurred within the taxable year beginning June 30, 1917, and ending June 30, 1918," and also that part of finding 31 to the effect that the abandonment of said mill and the ensuing loss were suffered "in the fiscal year ending June 30, 1918." The grounds of the motion were that these findings involve a conclusion of law and are inconsistent with and contrary to the facts found by the Commissioner of this court.

The motion in this respect should be overruled. That a loss was thus sustained is conceded and the evidence shows plainly the amount thereof. This being the case, the question of when the loss occurred is clearly a question of fact and not of law. No argument is presented to show that the findings under discussion are inconsistent with the other findings of the Commissioner, and in any event we do not find it necessary to determine this question as they are not inconsistent with the other findings made by the court.

■ The defendant also moves to strike finding 30 of the findings of the Commissioner to the effect that the contractors employed to construct the plate and bar mill acquiesced in its abandonment in the fiscal year ending June 30, 1918, and "thereafter no further steps were taken toward either the construction of the said bar and plate mills or the equipment thereof," which is said to be a conclusion and inconsistent with the other facts as found. But we think it is an ultimate fact, and that the motion should be overruled.

The defendant also moves to strike finding 22 which states: "The plaintiff suffered a loss as shown by the sale of the said open hearth plant and facilities (war facilities) of $462,300.94, on December 31, 1921," as a conclusion and not being supported by the evidence. This motion will be sustained on the ground that there is no evidence to support the finding. Our reasons for sustaining the motion will be more specifically stated hereinafter.

■ The first question to be determined is the proper place in plaintiff's income tax for the loss sustained on the bar and plate mill, which is practically conceded to be $970,702.61. The Commissioner found that the mill was a war facility and that plaintiff was entitled to a deduction for the amount of this loss, but allowed it as amortization, one-half to the first six months of 1918, and the remainder to the last six months of that year. We see no good reason for this action, either on the facts or the law. The plaintiff was entitled to the deduction and it could take it either as a loss or as amortization, for in this particular case the effect would be the same. In determining when the loss occurred, we find that the evidence shows that plaintiff commenced the construction of the bar and plate mill in 1916, that as the construction proceeded it became embarrassed for want of funds, and in the early part of 1918 it was unable to meet its obligations for work already done on the plant by contractors although only a portion of the work had been completed. It was also found that the design of the plant was not such that it could be profitably operated. Accordingly the project was abandoned, and the contractors notified to cease all operations thereon. The contractors acted in accordance with this notice and rendered bills to the plaintiff for the work performed and for damages for cancellation of their contracts. It is true that after the expiration of the fiscal year of 1918,

the plaintiff's officials had their hopes raised by some outside parties expressing themselves as favorable to extending a credit to install the plate mill, and an application was made to the War Finance Corporation to obtain a credit for that purpose, but these negotiations had no result. The loss of the company, in our opinion, dates from the time the project for the construction of the plate and bar mill was abandoned. It was then dead and the fact that plaintiff's officers might have afterwards had some faint hope of injecting life into the corpse does not alter the situation. At that time plaintiff admitted liability for the cancellation of the contract, and while its amount of liability was perhaps not definitely fixed, there was no dispute between the parties with reference to it. In such a situation the loss occurred and is deductible in the year of the abandonment. See Appeal of Connellee, 4 B. T. A. 359. We think that plaintiff was entitled to have the entire loss sustained on the project to construct the plate and bar mill deducted from its income for the fiscal year of 1918.

██ The question of whether the proof sustains plaintiff's claim for amortization on the open hearth plant is a more difficult one. The evidence shows that all of the property and assets of the plaintiff were sold on December 31, 1921, to the American Rolling Mill Company for a consideration of $6,034,113.57, and that plaintiff suffered a loss of $1,442,787.87, being the difference between the depreciated cost of the assets so sold which was $7,476,901.44 and the price received therefor, being $6,034,113.57. The sale included both the bar and plate mill and the open hearth plant with its accessories, the depreciated cost of which on December 31, 1921, was $3,569,196.49, and the depreciated cost of the open hearth plant and accessories on the same date was $1,276,678.62. Upon these figures counsel for plaintiff, assuming that the loss on the open hearth plant was sustained in the same proportions as upon the plant as a whole, computes that the loss by the sale on the open hearth plant was $462,300.94. But we cannot rightly assume that the percentage of loss was the same on the open hearth plant as upon the bar and plate mill, which was only partially constructed and then abandoned, with the result that it only had a scrap value, and if we could the amount so determined would be of little assistance in determining the amount of amortization on the bar and plate mill. The amount to be allowed as amortization is the amount of the depreciation resulting from the cessation of the war and a consequent inability to use the facilities which were constructed for war purposes. But the evidence shows that the open hearth plant was greatly depreciated by reason of improper use, which was caused by plaintiff's lack of funds to keep it in proper repair and suitable condition for the use which was made of it and that it had to be rebuilt by the purchaser to fit it for economical use. The sale price or sale value, therefore, cannot be used in determining the proper amount of amortization. The evidence shows that both plants were worth only about $600,000 when they were sold, and that the plate and bar mill in its unfinished condition had only the scrap value of the materials, being $324,881.93. It might thus be argued that the value of the open hearth plant could be determined by deducting this amount from the value of both plants, but when this is done, as stated above, we do not have a figure which can be used to determine the amount of amortization, and we must look elsewhere for evidence from which it may be ascertained.

██ The only other evidence which we have which bears upon the amount of amortization which may be allowed plaintiff is with reference to the use which was found for the mill in the postwar years, and the question is whether by using the evidence which shows the percentage of usable value to the capacity of the plant, we can determine the amount of amortization to which the plaintiff is entitled. If we hold that this percentage cannot be used in determining the amount of amortization, the holding is in effect not merely that no satisfactory evidence has been produced of the amount of amortization but that no such evidence can be produced. We have already held that under the peculiar circumstances of the case the amount of amortization cannot be determined from the sale price and it cannot be worked out from the amount of depreciation (wear and tear), for the two items are entirely distinct. Moreover, the depreciation in this particular case included the wear on the furnaces caused by the failure to keep them in repair, for which no allowance can be made in amortization and the amount of which it is impossible to prove. Does it follow, therefore, that while the statute purports to give the plaintiff a remedy it has in fact none? We think not. There can be no question but that the cessation of the war greatly decreased the value of facilities which, as in this case, were constructed solely by reason of the war, were employed upon war contracts, and to a large extent lost their use upon the cessation of the war. We

think the court should use the best evidence obtainable and fix the amount of amortization at the lowest figure consistent with this testimony.

The defendant insists that under the regulations, "plaintiff is limited in its claims to the establishment of the loss by the sale," and that "the sale price for the open-hearth plant was not shown, nor can it be shown." If the rule were that amortization could not be allowed unless a postwar sale price was shown by the evidence, there are comparatively few cases in which any relief could be granted, for in many, if not most, cases there was no sale. The statute does not require the application of any such rule, but, fairly construed, we think, intends that the allowance for amortization shall be measured by the loss or depreciation in value caused by the cessation of the war.

In Manville Jenckes Co., 4 B. T. A. 765, and Nunn, Bush & Weldon Shoe Co., 15 B. T. A. 918, it was held that the "value in use" of the property upon which amortization was claimed at the close of the amortization period may be used to determine the amount of amortization in connection with the depreciated value of the same property, and in both of the cases cited the maximum capacity of the plant was compared with the maximum production during the postwar years, within the period of amortization. The highest production or actual use of the open hearth mill and facilities was 211,590 tons in 1920. Its full capacity was 342,000 tons a year. In accordance with the rule laid down in the two cases last above cited, we compare maximum production with full capacity and thus ascertain that the use by the plaintiff of the open hearth mill and facilities after the cessation of the war was 61.7 per cent. of capacity and there was a loss in use of 38.3 per cent. of the cost. This percentage, however, is not to be applied to the whole cost of the

mill, but only to the cost of that portion of the plant and facilities which was constructed between April 6, 1917, and June 30, 1918, which, as before stated, was $1,606,974.12. 38.3 per cent. of this amount is $615,471, which is the loss in usable value of these facilities and the amount of amortization to which the plaintiff is entitled.

It may be said that this takes no account of the effect on the capacity of the mill of the failure to properly maintain the furnaces in repair. It is true that this method is not exact, but we think it complies with the rule laid down above. Moreover, if the furnaces had been kept in repair, the cost thereof would have been added as a capital expense to the depreciated cost, and the result would be approximately the same. It should be observed also in this connection that the equipment under consideration was not completed until June 30, 1918. The fact that the production of 1920 exceeded the amount produced in 1919 by more than 80,000 tons, or more than 60 per cent., tends to show that the capacity of the furnaces had not been very materially affected at that time by lack of repairs, and it may be safely presumed that they were used to the full extent that there was demand for their product. It will be noticed also that the amount which will be fixed by using this percentage as a basis is far less than the amount of amortization if we took the sale price as a basis. Taking into consideration all of the evidence, we think the ratio of the amount to be amortized to the depreciated cost is approximately 38.3 per cent., or $615,471.

The plaintiff is entitled to recover, but judgment will be withheld in order to give the parties in the case an opportunity to stipulate as to the amount of plaintiff's recovery in accordance with the foregoing opinion, and in event of the failure of the parties to agree, the court will make the computation and enter judgment accordingly.